[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
JULY 13, 2006
THOMAS K. KAHN
CLERK

Nos. 03-15640, 04-14959, 04-15006, 04-15062, 04-16180

_____

D. C. Docket No. 01-00208-CR-ASG

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

OSCAR RONDA,
JESUS AGUERO,  a.k.a. Jessie,
ARTURO BEGUIRISTAIN,
JORGE CASTELLO,
JORGE GARCIA,
ISRAEL GONZALEZ,
JOSE QUINTERO,  a.k.a. Pepe,

Defendants-Appellants.

_____

Appeals from the United States District Court
for the Southern District of Florida

_____

**(July 13, 2006)**

Before TJOFLAT and HULL, Circuit Judges, and RESTANI[*], Judge.

HULL, Circuit Judge:

This is a consolidated criminal appeal of the convictions and sentences of seven former Miami police officers. In the first trial, Appellants Oscar Ronda ("Ronda"), Jesus Aguero ("Aguero"), Arturo Beguiristain ("Beguiristain"), and Jorge Castello ("Castello") were convicted of conspiracy to obstruct justice, in violation of 18 U.S.C. §§ 1512(b)(3) and 371, and obstruction of justice, in violation of 18 U.S.C. § 1512(b)(3). The jury hung with respect to Appellants Jorge Garcia ("Garcia"), Israel Gonzalez ("Gonzalez"), and Jose Quintero ("Quintero").

Upon retrial, Appellants Garcia, Gonzalez and Quintero were convicted of conspiracy to obstruct justice, in violation of 18 U.S.C. §§ 1512(b)(3) and 371. The second jury also found Appellants Garcia and Gonzalez guilty of obstruction of justice, in violation of 18 U.S.C. § 1512(b)(3), and perjury before a federal grand jury, in violation of 18 U.S.C. § 1623.

Appellants challenge their convictions on numerous grounds and appeal their sentences under United States v. Booker, 543 U.S. 220, 125 S. Ct. 738 (2005). After review and oral argument, we affirm each Appellant's convictions

---

[*]Honorable Jane A. Restani, Chief Judge, United States Court of International Trade, sitting by designation.

and sentences.

## I. FACTS

Between 1995 and 1997, the seven Appellants were members of the Miami Police Department, where they worked for the Street Narcotics Unit and/or the Crime Suppression Team. Appellants were responsible for the detection of firearms violations, drug trafficking, and street-level crimes against property and individuals.

Each Appellant was involved in at least one of four police shootings. These four shootings are referred to by the name of the location where the shooting occurred: I-395, 43rd Street, Coconut Grove, and N.W. 7th Court.[1] The evidence at trial showed that Appellants illegally fabricated evidence to make the shootings appear justified, by planting guns at the scenes of the shootings and/or by making false and misleading statements to investigators.

We outline the evidence of the shootings and Appellants' efforts to mislead the ensuing investigations.

A.    **I-395 Shootings**

On November 7, 1995, Appellants Aguero, Beguiristain, Gonzalez, and Garcia were engaged in plainclothes activity in downtown Miami. They were

---

[1]Because none of the officers was convicted of charges related to the N.W. 7th Court shooting, that incident is not described below.

3

accompanied by non-party Officers Sampson, Mervolion, and Hames. Additional officers arrived at the scene later, as described below.

### (1) Officers Kill Two Suspects

The officers noticed a car occupied by four black men and suspected the men were involved in a recent "smash and grab" robbery. Seeing the car on the on-ramp near I-395, Appellant Beguiristain rammed into it with his patrol car. This disabled the suspects' car and forced the car onto I-395.

Two of the suspects, Derrick Wiltshire ("Wiltshire") and Antonio Young ("Young"), exited the car and began to flee. The two climbed over the highway guardrail, dangled themselves down from the rail, and dropped onto Miami Avenue, where they began to run from the scene.

As Young and Wiltshire fled, Appellants Aguero and Gonzalez and non-party Officers Mervolion and Hames shot them repeatedly.[2] Young died on Miami Avenue of multiple gunshot wounds in the back. Though Wiltshire had been shot, he fled to a nearby alley, chased by Officers Davis and Bell, two additional police officers who arrived at the scene quickly after hearing of the car crash and chase.

---

[2]Appellant Aguero fired twenty-one shots, three of which hit Young; Appellant Gonzalez fired two shots; Officer Mervolion (who pleaded guilty and became a government witness) fired two shots; Officer Hames (who pleaded guilty and became a government witness) fired nine shots. Appellant Garcia fired no shots, but he was partnered with Appellant Aguero at the time of the shooting and was standing on the I-395 overpass with the shooting officers.

4

Wiltshire died in the alley from multiple gunshot wounds after a brief struggle with Officer Bell.

At trial, Officers Mervolion and Hames (who both pleaded guilty to obstructing justice and testified for the government) testified that neither Young nor Wiltshire was armed and that the suspects never fired upon the officers. Non-party Officers Davis, Bell, and Sampson also testified that neither Young nor Wiltshire had a gun and that they did not see a gun near either victim's body immediately after the shootings. At least two civilian witnesses observed that neither Young nor Wiltshire appeared to be armed. No guns were found in the victims' car.

### (2)    Officers Plant Guns

Additional officers arrived at the scene after the shootings, including Appellants Beguiristain and Quintero. Despite the fact that neither Young nor Wiltshire had been armed, Beguiristain and Quintero each informed their superiors that they had found a gun near the suspects. Appellant Beguiristain handed over a gun he claimed to have found next to Young's body.[3] Appellant Quintero

---

[3]It normally would have been improper for Appellant Beguiristain to move such a gun had he found it at a crime scene, but Beguiristain claimed that Young had been moving and Beguiristain had moved the gun away to prevent Young from grabbing it. Young's autopsy revealed that Beguiristain's story was almost certainly untrue, as there was almost no chance that Young was moving after he was shot. According to the autopsy, bullets had punctured Young's left lung, his right kidney, his left and right thighs, his right arm, and his spinal column at the neck, the last (in the assessment of the medical examiner) causing instant paralysis.

produced a gun that he claimed to have found in the alley where Wiltshire died.[4]

Evidence at trial, in particular the testimony of Officers Mervolion and Hames, revealed that the two guns "found" near the bodies of Young and Wiltshire were in fact planted by the officers in order to justify the shootings of Young and Wiltshire. Officer Hames testified that immediately after the shooting, Appellant Beguiristain informed him that Appellant Quintero was on his way with a gun. Officer Mervolion testified that either Appellant Aguero or Appellant Garcia had said that he was "going to the station," and that Mervolion had understood the speaker to mean that he intended to obtain a weapon to plant at the scene.

### (3)    Officers Make False Statements

As a matter of department policy, the homicide unit of the Miami Police Department investigates all deaths involving police officers and all shootings by police officers, whether or not the shooting victim dies. Similarly, the Miami Police Department's internal affairs unit (rather than its homicide unit) investigates every situation where a Miami police officer discharges his weapon but the shot does not strike anyone. Appellants, as Miami police officers, knew that the I-395 shootings would be investigated.

---

[4]Appellant Quintero's discovery was suspect not only because none of the many witnesses to the shootings observed Wiltshire with a gun, but also because Quintero claimed to have found the gun nearly 100 feet from where Officer Bell had struggled with Wiltshire.

According to Officers Mervolion and Hames, the day after the shootings, Appellant Aguero organized a lunch meeting so that the officers could "get on the same page" before giving statements to investigators. Along with Officers Mervolion and Hames, Appellants Aguero, Beguiristain, Garcia, and Gonzalez attended this meeting. Officer Hames testified at trial that at the meeting, Hames proposed to the officers that they all state that Young and Wiltshire were holding guns in their right hands when they jumped from the expressway and fled from arrest.

The Miami Police Department's homicide unit did in fact open an investigation on the day of the I-395 shootings. On November 8, 1995, the day after the shootings, Appellants Beguiristain and Quintero each gave a sworn statement to Miami Police Department investigators. In his sworn statement, Appellant Beguiristain stated that when he approached Young after Young had been shot, Beguiristain found him "in pain" and "moving around." Beguiristain swore that he found a nine millimeter pistol lying next to Young, and that Beguiristain picked it up "[b]ecause the guy was still moving." In his sworn statement, Appellant Quintero stated that after arriving at the scene of the I-395 shootings, he entered the alley where Wiltshire had scuffled with Officer Bell and found a gun under a nearby bush.

7

Appellants Aguero, Garcia, and Gonzalez gave sworn statements to Miami Police Department investigators on November 14, 1995. In their sworn statements, Appellants Aguero and Garcia asserted that the I-395 suspects killed by the officers were armed with guns in their right hands and that the officers did not fire upon the suspects until the suspects aimed their guns at the officers. In his sworn statement, Appellant Gonzalez stated that he saw one of the fleeing suspects holding a gun in his right hand.[5]

As is standard practice in the Miami Police Department, the homicide unit's report on the I-395 shootings was forwarded to the Florida State Attorney's Office. The State Attorney's Office initiated a judicial inquest into the deaths of Young and Wiltshire.[6] During the course of that investigation, some of the officers involved in the I-395 shootings gave sworn depositions in Florida state court.

On April 2, 1996, Appellants Beguiristain and Quintero gave sworn testimony in the state judicial proceeding. In his sworn testimony, Appellant Beguiristain testified that after Young had been shot on November 7, 1995, Beguiristain found a nine millimeter pistol lying next to Young, and that Beguiristain picked it up because "[Young] was still moving around" and "I didn't

---

[5]As Officers Mervolion and Hames admitted during their testimony at both trials, each of them also gave false sworn statements to investigators following the I-395 shootings.

[6]As described in greater detail below, a multi-year investigation eventually ensued, encompassing all four police shootings involved in this case.

want him to grab the gun."  In his sworn testimony, Appellant Quintero averred that he found a "blue steel Browning" pistol in the alley where Officer Bell had struggled with Wiltshire.

In 1998, the State of Florida charged Jerry Miller, one of the I-395 suspects who was not shot by the officers, with armed battery and aggravated assault of a police officer.  On October 30, 1998, Appellant Garcia gave a sworn deposition in Miller's criminal case in Florida state court.  In his sworn testimony, Appellant Garcia reiterated that Young and Wiltshire had guns.

In 2000, Wiltshire's estate initiated a civil suit in federal district court in the Southern District of Florida, charging the City of Miami and the individual officers with wrongful death.  In that lawsuit, Appellant Gonzalez gave a sworn deposition on August 10, 2000.  In his deposition, Appellant Gonzalez testified that he saw what he believed to be a handgun in one of the fleeing suspects' right hand.

## B.    43rd Street Shooting

On April 13, 1996, a number of Miami officers chased suspect Steven Carter ("Carter") after a woman's purse was snatched.  Appellants Aguero, Beguiristain, Garcia, and Quintero were involved in the chase, as were non-party Officers Mervolion, Acuna and Williams.[7]  During the chase, Appellant Aguero fired his

---

[7]Officer Acuna was charged with the other officers.  The jury hung with respect to Acuna in the first trial, and the government dismissed the charges against Acuna rather than retry him.

weapon without striking Carter. Officer Mervolion eventually found and arrested Carter where he was hiding in a shed, unarmed.

According to Officer Mervolion's testimony at trial, Appellant Beguiristain, after the arrest, told Mervolion that they would need "that gun," alluding to a weapon Appellants Aguero and Quintero had stolen during an unrelated arrest. At Appellant Aguero's request, Officer Mervolion had kept the stolen gun in his police car, and he handed it over to Appellant Beguiristain to plant. After planting the gun under a tree, Appellant Beguiristain used his police radio to announce that he had "found" a gun on the scene. Appellant Aguero then directed the investigating officer to the gun, where Appellant Beguiristain had hidden it under some leaves.

On April 13, 1996, Appellant Aguero gave a sworn statement to investigators stating that during the chase, Carter turned in his direction and pointed a gun at him. On the same day, Appellant Beguiristain gave a sworn statement in which he claimed that after Carter was arrested, he found the gun underneath the pile of leaves.

## C. Coconut Grove

On June 26, 1997, Appellants Aguero, Beguiristain, Castello, and Garcia,

Officer Williams was never charged with any crimes.

along with non-party Officers Jacobo, Acuna, and Mervolion, were conducting a drug sting near the Cocowalk mall.

### (1) Officer Castello Shoots Unarmed Man

While patrolling near the Cocowalk mall, Appellant Castello and non-party Officer Jacobo drove up to a nearby convenience store in their patrol car. When they arrived, the officers observed two homeless men, Rick Simms ("Simms") and Daniel Hoban ("Hoban"), drinking beer outside the store. Simms and Hoban got into a minor scuffle. Appellant Castello and Jacobo got out of their car, yelling to Simms and Hoban to "drop it." Appellant Castello fired three shots, hitting Hoban in the leg.

According to the testimony of the Fire Chief, a paramedic, a passerby and a police officer, all of whom arrived at the scene shortly after the shooting, Hoban was unarmed and there was no weapon on the ground. Hoban's walkman radio was lying near him, which may have been in his hand, leading Appellant Castello to believe Hoban was armed.

### (2) Officers Plant Gun

Appellant Ronda, who was working a drug bust nearby, ran to the scene and arrived minutes after the shooting. Appellant Aguero and Officer Acuna arrived about fifteen minutes after the shooting, along with many other officers and

11

emergency response professionals.

Before arriving, Officer Acuna radioed Appellant Beguiristain to ask if he needed "anything from the locker." At trial, Officer Mervolion testified that he saw Appellant Aguero plant a handgun under a car at the scene of the shooting. Appellant Ronda then "discovered" this gun, fifteen minutes after the shooting and despite the fact that none of the others present at the scene had seen a gun until then. Later examination revealed Appellant Aguero's fingerprint on the side of the gun, even though the gun was supposedly not discovered or touched by Appellant Aguero.[8]

### (3) Officers Make False Statements

The Miami Police Department immediately initiated an investigation of the Coconut Grove incident. As part of the investigation, Appellant Ronda gave sworn statements to state law enforcement officers on July 15, 1997, and July 25, 1997. In both sworn statements, Appellant Ronda averred that within minutes of the shooting of Hoban, he ran to the scene and saw a "blue steel gun" on the ground near Hoban.

Appellant Beguiristain gave sworn statements to investigators on July 15, 1997, and July 16, 1997. In both sworn statements, Appellant Beguiristain

---

[8]Officer Hames testified that two months prior to the incident, Appellant Aguero had asked him to clean the same gun of prints and not to log it so that the gun "could be used later."

testified that he found a "blue steel gun" underneath a car near Hoban while Hoban was being treated by paramedics for the gunshot wound.

Appellant Castello gave a sworn statement to investigators on September 30, 1997. In his sworn statement, Appellant Castello testified that he saw a "blue steel gun" in Hoban's hand when he shot Hoban, and that he saw a "blue steel gun" on the ground immediately after shooting Hoban.

## II. PROCEDURAL HISTORY

### A. Federal Investigation

The state investigations into the shooting incidents were eventually joined by a parallel federal investigation into whether the officers had broken federal law by violating the constitutional and civil rights of the shooting victims. In late September 1997, two months after the June 26, 1997 Coconut Grove shooting, Randall A. Glass, an Agent in the Civil Rights Squad of the Federal Bureau of Investigation ("FBI"), opened an FBI investigation into the shooting based on media and newspaper reports of the incident. Specifically, the FBI investigated whether the shooting represented a potential violation of Hoban's federal constitutional and civil rights by local, state and federal officials. See 18 U.S.C. §§ 241 and 242.[9] The FBI investigation also sought to uncover whether Appellant

---

[9] 18 U.S.C. § 241 makes it unlawful in part for "two or more persons conspire to injure, oppress, threaten, or intimidate any person . . . in the free exercise or enjoyment of any right or

13

Castello had shot Hoban unnecessarily and whether he and other officers had then planted evidence to make the shooting appear justified.

Within less than a month, the FBI's investigation expanded to include the I-395, 43rd Street, and N.W. 7th Court shootings. During the course of its investigation, the FBI requested and received from the Miami Police Department the entire case files from the Department's investigations of all four shooting incidents. These files included transcripts of all the sworn statements made by the Appellants over the preceding years.

A federal grand jury was empaneled in the Southern District of Florida to investigate whether any of the officers had broken federal law. As part of the

privilege secured to him by the Constitution or laws of the United States, or because of his having so exercised the same."

    18 U.S.C. § 242 states:

    Whoever, under color of any law, statute, ordinance, regulation, or custom, willfully subjects any person in any State, Territory, Commonwealth, Possession, or District to the deprivation of any rights, privileges, or immunities secured or protected by the Constitution or laws of the United States, or to different punishments, pains, or penalties, on account of such person being an alien, or by reason of his color, or race, than are prescribed for the punishment of citizens, shall be fined under this title or imprisoned not more than one year, or both; and if bodily injury results from the acts committed in violation of this section or if such acts include the use, attempted use, or threatened use of a dangerous weapon, explosives, or fire, shall be fined under this title or imprisoned not more than ten years, or both; and if death results from the acts committed in violation of this section or if such acts include kidnapping or an attempt to kidnap, aggravated sexual abuse, or an attempt to commit aggravated sexual abuse, or an attempt to kill, shall be fined under this title, or imprisoned for any term of years or for life, or both, or may be sentenced to death.

14

investigation, Appellant Garcia testified before the federal grand jury on August 9, 2001. In his sworn grand jury testimony, Appellant Garcia stated that he had no doubt that two of the I-395 suspects were carrying guns, and that the officers fired at the suspects only after they pointed their guns at the officers.

On August 16, 2001, Appellant Gonzalez testified before the federal grand jury. When asked about one of the suspects fleeing the I-395 scene, Appellant Gonzalez testified, "I believe that he was armed." When asked if he recalled where he saw the weapon, Appellant Gonzalez replied, "in his right hand." When asked if he was able to see the gun as the suspect was running, Appellant Gonzalez replied, "Yes." Appellant Gonzalez was also asked, "[y]ou just saw him carrying the weapon as he was running, right?," to which Gonzalez responded, "[r]ight."

**B.    Indictment**

On September 6, 2001, the grand jury returned a superseding indictment against the seven Appellants, along with four other officers. This indictment was the relevant one for the first trial, at which Appellants Ronda, Aguero, Beguiristain and Castello were convicted. Subsequent to the verdict in the first trial, on May 30, 2003, a second superseding indictment was issued with respect to Appellants Garcia, Gonzalez, and Quintero. The second superseding indictment charged Garcia, Gonzalez and Quintero with the same counts as had been charged in the

15

earlier indictment. However, the second superseding indictment focused solely on the I-395 shootings and did not raise any allegations with respect to the other shootings. Because the differences between the two indictments are not material to most of the issues on appeal, we refer to them collectively as "the indictment" wherever the distinction is irrelevant.

Count One of the first superseding indictment charged all seven Appellants with conspiracy to obstruct justice, in violation of 18 U.S.C. § 1512(b)(3) (obstruction of justice)[10] and 18 U.S.C. § 371 (conspiracy to commit any federal offense).[11] The government grouped all four shooting incidents as a single related conspiracy to hinder investigation of the shootings themselves; the officers were not charged with four separate conspiracies. Count One of the second superseding indictment charged Garcia, Gonzalez and Quintero with a similar conspiracy to obstruct justice, also in violation of 18 U.S.C. §§ 1512(b)(3) and 371. Count One of the second superseding indictment, however, focused solely on the I-395

---

[10]It is a violation of § 1512(b)(3) whenever a person "uses intimidation, threatens, or corruptly persuades another person, or attempts to do so, or engages in misleading conduct toward another person, with intent to . . . hinder, delay, or prevent the communication to a law enforcement officer or judge of the United States of information relating to the commission or possible commission of a Federal offense . . . ." 18 U.S.C. § 1512(b)(3).

[11]It is a violation of § 371 "[i]f two or more persons conspire either to commit any offense against the United States, or to defraud the United States, or any agency thereof in any manner or for any purpose, and one or more of such persons do any act to effect the object of the conspiracy . . . ." 18 U.S.C. § 371.

16

shootings.

The remaining counts in the indictments charged Appellants, with the exception of Appellant Quintero, with specific acts of obstruction of justice, in violation of 18 U.S.C. § 1512(b)(3). Specifically, Counts Six through Ten of the first superseding indictment charged Appellants Beguiristain, Ronda and Castello with specific acts of obstructing justice by making false and misleading statements to investigators in relation to the Coconut Grove shooting.[12] Count Eleven charged Officer Acuna and Appellants Ronda, Aguero, Beguiristain, and Castello with obstructing justice by planting or aiding in the planting of a gun at the site of the Coconut Grove shooting. The remaining counts of the first superseding indictment either pertained only to Appellants Garcia, Gonzalez or Quintero, or did not result in convictions, and therefore those counts are not discussed further.

In addition to the Count One conspiracy charge, the second superseding indictment charged Appellants Garcia and Gonzalez with one count each of obstruction of justice, in violation of 18 U.S.C. § 1512(b)(3), and with one count each of perjury before a federal grand jury, in violation of 18 U.S.C. § 1623. These

---

[12]Counts Six and Seven charged Appellant Beguiristain with giving false and misleading statements on July 15, 1997 and July 16, 1997 respectively. Counts Eight and Nine charged Appellant Ronda with giving false and misleading statements on July 15, 1997 and July 25, 1997 respectively. Count Ten charged Appellant Castello with giving a false and misleading statement on September 30, 1997.

17

counts all related to the I-395 shootings and investigation.

## C.    Convictions

The first trial of all eleven officers began on January 6, 2003, and lasted for

over two and a half months.  After twenty days of deliberation, on April 9, 2003,

the first jury convicted four defendants – Appellants Ronda, Aguero, Beguiristain

and Castello – of conspiracy to obstruct justice, in violation of 18 U.S.C. §§

1512(b)(3) and 371, and obstruction of justice, in violation of 18 U.S.C. §

1512(b)(3).[13]  The first jury hung with respect to four defendants: Officer Acuna

and Appellants Garcia, Gonzalez, and Quintero.  The remaining three defendants,

who were involved only in the N.W. 7th Court shooting, were acquitted.

Prior to re-trial, the government dismissed the charges against Acuna.

Appellants Garcia, Gonzalez, and Quintero were then re-tried between February

23, 2004, and April 1, 2004.  The second jury convicted Appellants Garcia,

Gonzalez and Quintero of conspiracy to obstruct justice, in violation of 18 U.S.C.

§§ 1512(b)(3) and 371.  The second jury also convicted Appellants Garcia and

---

[13]Specifically, Appellant Ronda was found guilty of conspiracy to obstruct justice (Count One) and two counts of obstruction of justice (Counts Eight and Nine); Appellant Aguero was found guilty of conspiracy to obstruct justice (Count One) and one count of obstruction of justice (Count Eleven); Appellant Beguiristain was found guilty of conspiracy to obstruct justice (Count One) and two counts of obstruction of justice (Counts Six and Seven); and Appellant Castello was found guilty of conspiracy to obstruct justice (Count One) and one count of obstruction of justice (Count Ten).  Appellants Ronda, Beguiristain and Castello were acquitted on Count Eleven.

Gonzalez of obstruction of justice, in violation of 18 U.S.C. § 1512(b)(3), and perjury before a federal grand jury, in violation of 18 U.S.C. § 1623.

The district court sentenced Appellant Beguiristain to 27 months' imprisonment; Appellant Aguero to 37 months' imprisonment; and Appellants Castello and Ronda each to 13 months' imprisonment. The district court sentenced Appellants Garcia, Gonzalez and Quintero each to 16 months' imprisonment.

## III. APPEAL OF CONVICTIONS

On appeal, all seven Appellants contend that (1) the government failed to prove that their misleading conduct was directed at federal officials; (2) the district court abused its discretion by declining to give a jury instruction on Florida's fleeing felon statute; and (3) the evidence was insufficient to support their convictions for participating in an overarching conspiracy. Appellant Gonzalez also argues that his perjury and obstruction of justice convictions were not supported by sufficient evidence. Finally, Appellants Garcia, Gonzalez and Quintero assert that they should be retried or acquitted because the jury in the second trial was tainted by external evidence. We address each of these arguments in turn.[14]

---

[14]Appellants also argue that: (1) acquittal or a new trial is warranted due to at least twelve instances where the prosecution suppressed exculpatory evidence in violation of Brady v. Maryland, 373 U.S. 83, 83 S. Ct. 1194 (1963); (2) a new trial is warranted because a post-trial interview with Coconut Grove witness Eric Soto constituted newly discovered evidence that was

## A.    Federal Nexus

All seven Appellants challenge their convictions for conspiracy to obstruct justice by contending that the government failed to show a sufficient "federal nexus" between their misleading conduct and the investigation they allegedly obstructed.  We review the elements of the particular obstruction-of-justice offense in this case and then explain why Appellants' argument lacks merit.

Count One charged Appellants with conspiring to obstruct justice in violation of 18 U.S.C. §§ 1512(b)(3) and 371.  While § 1512(b) sets forth different types of obstruction-of-justice crimes, the only one at issue here is defined in § 1512(b)(3).  In relevant part, 18 U.S.C. § 1512(b)(3) defines obstruction of justice as "engag[ing] in misleading conduct toward another person, with intent to . . . hinder, delay, or prevent the communication to a law enforcement officer or judge of the United States of information relating to the commission or possible commission of a Federal offense . . . ."  18 U.S.C. § 1512(b)(3).  Thus, to obstruct justice in violation of § 1512(b)(3), a defendant must knowingly and willfully (1) engage in misleading conduct toward another person, (2) with the intent to hinder,

likely to have led to acquittal, see United States v. Fernandez, 136 F.3d 1434, 1438 (11th Cir. 1998); and (3) a new trial is mandated by the cumulative effect of an unfair trial atmosphere and numerous other trial errors.  After review and oral argument, we conclude that these arguments and any other arguments not addressed in further detail in this opinion lack merit and warrant no further discussion.

delay or prevent the communication of information to a federal official, (3) about the commission or the possible commission of a federal crime. United States v. Veal, 153 F.3d 1233, 1253 (11th Cir. 1998), cert. denied, 526 U.S. 1147, 119 S. Ct. 2024 (1999).

More specifically, Count One of the indictment charged that by planting the guns and lying about the shootings, the defendants conspired to hinder the communication of information about the shootings to federal officials.[15] The "possible commission of a federal crime" named in the indictment was the possibility that the police shootings violated the victims' federal rights. See 18 U.S.C. § 241 (making it unlawful where "two or more persons conspire to injure, oppress, threaten, or intimidate any person . . . in the free exercise or enjoyment of any right or privilege secured to him by the Constitution or laws of the United States, or because of his having so exercised the same"); 18 U.S.C. § 242 (making it a federal crime for any person acting under color of law to deprive a citizen of his constitutional or civil rights). In other words, the government asserted that by planting the guns and lying under oath, the officers intentionally hindered any federal investigation into whether the shootings violated 18 U.S.C. §§ 241 and

---

[15]As stated above, the second superseding indictment regarding Garcia, Gonzalez and Quintero focused only on their obstruction of justice with respect to the investigation of the I-395 shootings.

21

242.[16]

### (1)    United States v. Veal

Appellants' "federal nexus" argument focuses on the second required element of 18 U.S.C. § 1512(b)(3), the intent to hinder a federal investigation. Appellants contend that their false statements and misleading actions were exclusively directed at state investigators and were never intended to be communicated to federal officials. As such, Appellants argue that the government failed to demonstrate the "federal nexus" necessary to uphold their convictions.

Appellants' "federal nexus" argument is indistinguishable from the same claim rejected by this Court in Veal, 153 F.3d at 1250. The defendants in Veal were four Miami police officers who beat a suspect to death and then lied to state investigators about the beating. The four officers were convicted of violating 18 U.S.C. § 1512(b)(3) based on their false statements. On appeal, the Veal defendants argued that although they misled state investigators, they nonetheless could not be convicted of violating § 1512(b)(3) because they lacked the required intent for their misleading statements to reach federal officials. Veal, 153 F.3d at 1247-48.

---

[16]Although an earlier indictment charged the officers directly with conspiring to violate the civil rights of the shooting victims, those charges were dropped voluntarily by the government prior to the relevant indictment in this case.

In Veal, we rejected this "lack of federal nexus" argument and concluded that § 1512(b)(3) does not require a specific intent to mislead federal officials. Id. at 1252. Rather, "[f]or violation of § 1512(b)(3), it is sufficient if the misleading information is likely to be transferred to a federal agent." Id. at 1251 (emphasis in original); see also 18 U.S.C. § 1512(g) (stating a prosecution under § 1512 does not require proof of any state of mind regarding whether the officials or proceedings that received the misleading information were federal officials or proceedings). Even though the Veal defendants had misled only state investigators, there existed "the possibility or likelihood that their false and misleading information would be transferred to federal authorities irrespective of the governmental authority represented by the initial investigators." Veal, 153 F.3d at 1251-52 (emphasis in original).

The instant case is indistinguishable from Veal. The guns Appellants planted and the misleading statements Appellants made were directed at the state investigators who began the investigation of the police shootings. Regardless, as detailed below, this misleading information was likely to be transferred to federal investigators, and thus Appellants violated § 1512(b)(3). Indeed, the evidence at trial showed that Appellants' misleading information was not only "likely" to be transferred to federal investigators, it in fact was transferred to federal

23

investigators.

### (2) Likelihood of Federal Investigation

As testimony at both trials indicated, as a matter of department policy, the homicide unit of the Miami Police Department investigates all deaths involving police officers and all shootings by police officers, whether the shooting victim dies or not. Similarly, the Miami Police Department's internal affairs unit investigates every situation where a Miami police officer discharges his weapon but the gunshot does not strike anyone. Indeed, in the first trial, Captain David Rivero of the Miami Police Department testified that after any incident in which a Miami police officer draws and fires his weapon, the Miami Police Department initiates a "massive investigation."[17] Thus, even before Appellants planted the guns at the scenes of the shootings, Appellants knew that any police shooting incident would be investigated by state officers. Indeed, Appellants' knowledge that the shootings assuredly would be investigated was precisely what motivated them to plant evidence and to conspire to lie about the shootings.

More importantly for purposes of resolving the § 1512(b)(3) legal issue here, federal investigation into the police shootings was a distinct probability from

---

[17]At the second trial, Commander Bobby Meeks of the Miami Police Department testified similarly. Commander Meeks testified that any time a Miami police officer discharges his weapon, the incident will be investigated by either the homicide unit or the internal affairs unit. At the time of the I-395 shootings, Meeks headed the Miami Police Department's homicide unit.

the very onset of Appellants' misleading conduct. According to Captain Rivero, the investigation by state officials into any shooting frequently involves consultation with federal officials, in particular the U.S. Attorney's Office. Captain Rivero testified specifically that when the Miami Police Department investigates a police shooting, the sworn statements by the shooting officers are often forwarded to federal law enforcement agencies. According to Captain Rivero, "[i]f it is a questionable shooting, we will contact the [FBI] and we will have them look at it to see if there is anything federally that they can pursue." Captain Rivero testified that "[a]ny time we have an officer that discharges his weapon and the shooting is questionable, we reach out to the [FBI] and we let them look through the case, and that is a standard practice."[18]

Likewise, FBI Agent Glass explained that the FBI's Civil Rights Squad investigates potential violations of federal constitutional and civil rights by local, state and federal officials.[19] See 18 U.S.C. §§ 241 and 242. Agent Glass testified that the Civil Rights Squad regularly conducts investigations of allegations of

---

[18]Captain Rivero did not testify in the second trial. However, the parties in the second trial stipulated that if he were called, Captain Rivero would have testified that: (1) between 1998 and March 2003, he was the deputy commander of the Miami Police Department's Criminal Investigation Section, which includes the homicide unit; (2) on or around April or May 2001, in response to a subpoena, he provided the U.S. Attorney's Office with the Miami Police Department's entire homicide case file concerning the I-395 shootings; and (3) that this file contained all the shooting officers' sworn statements.

[19]Agent Glass testified at both trials.

25

excessive force by state officials, and has on a number of occasions investigated actions by police officers in South Florida.

In the instant case, the federal investigation that was distinctly probable at the time of the shootings unsurprisingly began not long thereafter. Captain Rivero testified that he personally provided the FBI with the entire case files from the Miami Police Department's investigations of all four shooting incidents. Agent Glass averred that in late September 1997 – two months after the Coconut Grove shooting on June 26, 1997 – the FBI opened an investigation into the Coconut Grove shooting. Shortly thereafter, the FBI's investigation expanded to include all of the shooting incidents described in Appellants' trials.

As we explained in Veal, "federal jurisdiction under § 1512(b)(3) is based on the federal interest of protecting the integrity of potential federal investigations by ensuring that transfers of information to federal law enforcement officers and judges relating to the possible commission of federal offenses be truthful and unimpeded." Veal, 153 F.3d at 1250 (emphasis added). Section 1512(b)(3) "does not depend on the existence or imminency of a federal case or investigation but rather on the possible existence of a federal crime and a defendant's intention to thwart an inquiry into that crime." Id. (emphasis in original).

Under the standard articulated in Veal, the government proved the federal

26

nexus required for the § 1512(b)(3) convictions in this case. From the time the

Appellants entered the conspiracy to mislead investigators, a federal investigation

into the shootings was not only possible, it was highly probable.

### (3)    Arthur Andersen v. United States

Although Veal clearly controls the instant case, Appellants contend that the

recent Supreme Court decision in Arthur Andersen LLP v. United States, 544 U.S.

696, 125 S. Ct. 2129 (2005), requires that we revise the standard set forth in Veal

and overturn Appellants' convictions. We disagree. Contrary to Appellants'

argument, Arthur Andersen involved a different criminal statute and does not

implicitly overrule Veal.

In Arthur Andersen, the Supreme Court reversed a corporation's conviction

for obstruction of justice pursuant to 18 U.S.C. § 1512(b)(2), the subsection that

precedes 18 U.S.C. § 1512(b)(3), the statute at issue here.[20] Specifically, the

---

[20]18 U.S.C. § 1512(b) states in full that
Whoever knowingly uses intimidation, threatens, or corruptly persuades another person, or attempts to do so, or engages in misleading conduct toward another person, with intent to –
(1) influence, delay, or prevent the testimony of any person in an official proceeding;
(2) cause or induce any person to –
(A) withhold testimony, or withhold a record, document, or other object, from an official proceeding;
(B) alter, destroy, mutilate, or conceal an object with intent to impair the object's integrity or availability for use in an official proceeding;
©) evade legal process summoning that person to appear as a witness, or to produce a record, document, or other object, in an official proceeding; or
(D) be absent from an official proceeding to which such person has been

accounting firm Arthur Andersen was convicted of one count of violating 18 U.S.C. § 1512(b)(2)(A) and (B) by corruptly persuading its employees to withhold testimony and documents from "an official proceeding," in violation of 18 U.S.C. § 1512(b)(2)(A), and to destroy documents and other records with intent to impair their integrity or availability for use in "an official proceeding," in violation of 18 U.S.C. § 1512(b)(2)(B). Arthur Andersen, 544 U.S. at 702, 125 S. Ct. at 2134. The Supreme Court reversed those convictions, finding in part that the district court's jury instructions led the jury to believe it did not have to find "any nexus between the persuasion to destroy documents and any particular [official federal] proceeding." Id. at 707, 125 S. Ct. at 2136 (punctuation omitted). The Supreme Court held that to be found guilty of violating 18 U.S.C. § 1512(b)(2), "[a] knowingly corrupt persuader cannot be someone who persuades others to shred documents . . . when he does not have in contemplation any particular official proceeding in which those documents might be material." Id. at 708, 125 S. Ct. at 2137 (punctuation omitted) (emphasis added).

Appellants insist that Arthur Andersen's holding with respect to 18 U.S.C. §

summoned by legal process; or
(3) hinder, delay, or prevent the communication to a law enforcement officer or judge of the United States of information relating to the commission or possible commission of a Federal offense or a violation of conditions of probation, supervised release, parole, or release pending judicial proceedings;
shall be fined under this title or imprisoned not more than ten years, or both.

28

1512(b)(2) applies with equal force to their convictions under 18 U.S.C. § 1512(b)(3). Appellants assert that at the time they misled state investigators, they were not aware of any ongoing federal proceeding investigating their conduct, and in fact no such federal investigation existed. Appellants extrapolate that, as in Arthur Andersen, they cannot be found criminally liable where there was no official federal investigation until after their charged conduct took place.

Appellants' attempt to analogize to Arthur Andersen is unavailing. Arthur Andersen interpreted and applied only § 1512(b)(2), which explicitly requires that the acts of obstruction relate to "an official proceeding." Unlike § 1512(b)(2), § 1512(b)(3) makes no mention of "an official proceeding" and does not require that a defendant's misleading conduct relate in any way either to an "official proceeding" or even to a particular ongoing investigation. See 18 U.S.C. § 1512(b)(3); see also United States v. Byrne, 435 F.3d 16, 24 (1st Cir. 2006). There is simply no reason to believe that the Supreme Court's holding in Arthur Andersen requires that we graft onto § 1512(b)(3) "an official proceeding" requirement based on statutory language in § 1512(b)(2) that does not appear in § 1512(b)(3).

As we already noted in Veal, the federal nexus required under § 1512(b)(2) is distinct from that required under § 1512(b)(3). Veal, 153 F.3d at 1249-50.

29

Unlike the stricter "an official proceeding" requirement that appears in § 1512(b)(2), § 1512(b)(3) requires only that a defendant intended to hinder, delay, or prevent communication to any "law enforcement officer or judge of the United States." Id. at 1248; 18 U.S.C. § 1512(b)(3). This distinction was critical to our decision in Veal that § 1512(b)(3) requires only "the possible existence of a federal crime and a defendant's intention to thwart an inquiry into that crime." Veal, 153 F.3d at 1250 (emphasis in original).

As we explained in Veal, § 1512(b)(3) "criminalizes the transfer of misleading information which actually relates to a potential federal offense . . . . " Veal, 153 F.3d at 1252 (emphasis in original). The Veal Court correctly emphasized that § 1512(b)(3) does not require that a federal investigation be initiated nor that an official proceeding be ongoing. Id. Because Veal already distinguished between § 1512(b)(2) and (b)(3), Veal's interpretation of § 1512(b)(3) is in no way altered by Arthur Andersen's reading of § 1512(b)(2). See also Byrne, 435 F.3d at 24 (finding Arthur Andersen irrelevant to § 1512(b)(3)). In short, Veal still controls Appellants' convictions.

**B.    Jury Instruction on Fleeing Felon Statute**

Appellants next contend that their convictions must be overturned because the district court failed to give a jury instruction concerning Florida's fleeing felon

statute.  See Fla. Stat. § 776.05.  In relevant part, § 776.05 provides that a police

officer is justified in using force against a fleeing felon in various circumstances, as

follows:

> A law enforcement officer . . . is justified in the use of any force . . . (3) When necessarily committed in arresting felons fleeing from justice . . ., and (a) The officer reasonably believes that the fleeing felon poses a threat of death or serious physical harm to the officer or others; or (b) The officer reasonably believes that the fleeing felon has committed a crime involving the infliction or threatened infliction of serious physical harm to another person.

Id.  Appellants contend that § 776.05 authorizes all of the police shootings in this

case, and that the lawfulness of the shootings themselves constitutes a complete

defense to the obstruction-of-justice charges.

The district court denied Appellants' request for a jury instruction on this

fleeing felon statute.  Instead, the district court decided that it would be more

appropriate to introduce the fleeing felon statute itself into evidence.  Accordingly,

prior to closing statements in the first trial, the district court briefly reopened the

case to allow defense counsel to read the fleeing felon statute to the jury.  The

district court then took judicial notice of the statute and provided the jurors with

written copies of the statute.  The district court followed the same procedure in the

second trial, allowing the defense to read the fleeing felon statute into evidence,

taking judicial notice of it, and providing copies to the jury.

31

The district court admitted the statute into evidence in order to ensure that the jury could consider Appellants' arguments that they had no motive to plant guns and to lie about the shootings because the shootings were arguably justified by Florida's fleeing felon statute. Appellants, of course, did not object to the statute being admitted into evidence and read to the jury, and they do not raise any issue on appeal about that procedure. Rather, Appellants' sole argument is that the statute should have also been part of the district court's jury instructions.

The government first argues that Appellants waived this issue in the district court. The government posits that Appellants effectively consented, or at least did not adequately object, to the district court's decision to publish the fleeing felon statute as evidence in lieu of giving a jury charge based on the statute. When the district court, during the first trial, proposed to publish the statute rather than issue a jury instruction, Appellant Beguiristain's counsel replied, "[a]s long as [the fleeing felon statute] comes before the jury, I don't think we have a technical objection." The district court specifically proposed that "I reopen to allow judicial notice of [the fleeing felon statute], and that can be read [to the jury]. . . . But I don't think it is appropriate just to put [the fleeing felon statute] in the instructions as something that stands alone because it doesn't relate to anything." Appellant Beguiristain's counsel responded, "[w]e have no objection to that technique, your

32

honor." After this compromise was worked out, counsel for the remaining Appellants raised no objections.

Likewise, when the fleeing felon statute was discussed prior to closing statements in the second trial, Appellant Gonzalez's counsel stated, "[w]ith regard to the judicial notice [of the fleeing felon statute], Judge, we've agreed the way it was done last year [in the first trial] is the same way we would like it this year." According to the government, Counsel for Appellants Garcia and Quintero raised no objections and thereby also effectively consented.

In response, Appellants argue that the government quotes part of the record out of context, ignoring other sections where Appellants preserved their objection to the district court's failure to instruct the jury on the fleeing felon statute. For example, Appellants point to the fact that they agreed to the district court's final jury instructions with the caveat of "without waiving our prior objections." We need not resolve the waiver issue, because even assuming Appellants adequately objected, Appellants have failed to establish any reversible error based on the district court's not giving the requested instruction.[21]

---

[21]Accordingly, we expressly do not address whether the district court's decision to read the Florida fleeing felon statute into evidence and to publish the statute to the jury was required or permissible. We review only whether the district not also including the statute in its jury charge was an abuse of discretion. United States v. Garcia, 405 F.3d 1260, 1273 (11th Cir. 2005).

33

Appellants' primary basis for their requested jury charge is, essentially, that because the shootings were authorized under Florida's fleeing felon statute, the shootings could not have constituted violations or possible violations of federal civil rights law.[22]  Appellants contend that if the shootings themselves were lawful, even assuming Appellants hindered the investigation into the shootings, Appellants nonetheless did not violate § 1512(b)(3), because they did not "hinder, delay, or prevent the communication . . . of information relating to the commission or possible commission of a Federal offense."  18 U.S.C. § 1512(b)(3) (emphasis added).[23]

The fatal flaw in Appellants' argument is that even if the police shootings themselves were ultimately determined to be lawful, the Appellants still violated the law by obstructing the investigations into the shootings.  Essentially, Appellants' jury instruction argument presumes that it is lawful to obstruct justice so long as the obstructed investigation ultimately "wouldn't have found anything

---

[22]The "possible federal crime" alleged in the indictment is the possibility, as investigated by the FBI for over four years, that the police shootings violated the federal civil rights of the shooting victims. See 18 U.S.C. §§ 241 and 242; see also supra note 9.

[23]Contrary to the government's assertion on appeal, Appellants have always offered this reason as their primary rationale for a jury instruction on Florida's fleeing felon statute.  As counsel for Appellant Beguiristain stated during the jury instruction colloquy in the first trial, "[w]e are asking that [the fleeing felon jury instruction] be given . . . so the jury understands what the possible nexus crime means."  The district court clearly understood that Appellants were requesting the "fleeing felon" instruction principally to support their argument that because the shootings themselves were not "possible federal crimes," Appellants could not have violated 18 U.S.C. § 1512(b)(3).

criminal anyway." This misconstrues the meaning of obstruction of justice and ignores that § 1512(b)(3) criminalizes the obstruction of an investigation into either the commission of a federal offense or an investigation into the possible commission of a federal offense. 18 U.S.C. § 1512(b)(3).

As we said in Veal, "[b]y its wording, § 1512(b)(3) does not depend on the existence or imminency of a federal case or investigation but rather on the possible existence of a federal crime and a defendant's intention to thwart an inquiry into that crime." Veal, 153 F.3d at 1250 (emphasis in original). The fabrication of evidence to mislead federal investigators violates § 1512(b)(3) whether or not the potential federal investigation would have uncovered sufficient evidence to prove that a federal crime was actually committed. See United States v. Cobb, 905 F.2d 784, 790 (4th Cir. 1990) (under § 1512(b)(3), "proof of an actual commission of a federal offense is not a necessary prerequisite to, or an essential element of, the crime of obstruction of justice"); United States v. Applewhaite, 195 F.3d 679, 687 (3d Cir. 1999) ("[I]f the investigation or prosecution a defendant tries to hamper turns out to be federal, the witness is guilty of tampering with a federal witness even if the prosecution is unable to establish the facts necessary to establish a violation of federal law."); United States v. Baldyga, 233 F.3d 674, 681 (1st Cir. 2000) ("Section 1512(b)(3) does not require that the defendant be convicted of the

35

federal offense . . . . [T]he dispositive issue is the federal character of the investigation, not guilty verdicts on any federal offenses that may be charged.").

Thus, given the nature of the § 1512(b)(3) charges being tried and all other factual circumstances of this particular case, we conclude that Appellants have shown no reversible error due to the lack of this jury instruction.

## C. Conspiracy Convictions

Appellants Ronda, Aguero, Beguiristain and Castello also contend that the government failed to prove the overarching conspiracy charged in Count One.[24] Specifically, Appellants argue that the government failed to prove that they were involved in a single conspiracy to plant guns in all four shootings and to hinder the investigation into all four shootings. Relatedly, Appellants assert that the district court erred by declining to sever the first trial into separate trials concerning each shooting. These arguments fail.

The government's proof of an overarching conspiracy to hinder investigation into the shootings was overwhelming. Multiple Appellants participated in more than one of the cover-ups, highly indicative that the officers were involved in a conspiracy that transcended any particular shooting incident.

---

[24]We review these challenges to the sufficiency of the evidence de novo, making all reasonable inferences and credibility choices in the government's favor. United States v. Simpson, 228 F.3d 1294, 1298 (11th Cir. 2000).

Likewise, the officers' immediate access to "throw-down" guns to plant at multiple shooting scenes demonstrated planning, pre-meditation, and an ongoing scheme to obstruct justice. Voluminous additional evidence confirmed that all Appellants took part in the conspiracy.[25] Moreover, the fact that a particular Appellant may not have participated in every act of the conspiracy is no defense. See United States v. Cole, 755 F.2d 748, 755 (11th Cir. 1985).

Even assuming arguendo that the government proved multiple conspiracies rather than the single conspiracy alleged in Count One, Appellants are unable to explain how this prejudiced them. See United States v. Coy, 19 F.3d 629, 634

---

[25]For example, direct and circumstantial evidence supported each Appellant's convictions, including: (1) according to the testimony of Officer Hames, at the lunch meeting after the I-395 shootings, Appellants Aguero, Beguiristain, and Garcia, along with Officer Mervolion, Officer Hames, and one person Hames could not recall, explicitly conspired to mislead investigators; (2) according to the testimony of Officer Mervolion, at the lunch meeting after the I-395 shootings, Appellants Aguero, Beguiristain, Garcia, and Gonzalez, along with Officers Mervolion and Hames, explicitly conspired to mislead investigators; (3) following the lunch meeting, Appellants Aguero, Beguiristain, Garcia, and Gonzalez each gave similar false sworn testimony to investigators concerning the I-395 shootings; (4) according to Officers Mervolion and Hames, Appellant Quintero planted one of the guns found at the I-395 shooting and conferred with them about doing so; (5) Appellant Quintero gave multiple false sworn statements about the I-395 shootings, statements that were consistent with the false sworn statements of Appellants Aguero, Beguiristain, Gonzalez and Garcia; (6) Appellant Aguero's fingerprint on the gun found at the site of the Coconut Grove shooting and the testimony of Officer Mervolion indicated that Aguero planted the weapon; (7) Appellant Castello (the shooter in the Coconut Grove incident) and Appellant Ronda (the first officer to arrive after the shooting) could not have "found" the gun until Appellant Aguero planted it at least fifteen minutes after the shooting; (8) Appellants Beguiristain, Castello and Ronda gave identical and seemingly coordinated false statements asserting that they saw a "blue steel gun" on the ground immediately following the Coconut Grove shooting; and (9) multiple witnesses testified to the fact that a number of Appellants stole guns during arrests and saved them for later situations where they might be planted as evidence.

37

(11th Cir. 1994) (proof of multiple conspiracies in place of a single alleged conspiracy only prejudicial if (1) there is inadequate opportunity to prepare a defense, or (2) the jury is likely to be confused about which defendants were involved in which conspiracies). Appellants make no argument that they were unable to prepare an adequate defense on account of the joinder of all four shootings into a single conspiracy charge. Moreover, given that the jury acquitted three of the original defendants and hung with respect to four others, there is no reason to believe the jury was unable to distinguish between the involvement of the various defendants. See United States v. Hernandez, 921 F.2d 1569, 1580-81 (11th Cir. 1991) (stating that severance is only warranted where there is reason to believe the jury would be prejudicially confused, and that severance is not required merely because a complex case involves many defendants); Richardson v. Marsh, 481 U.S. 200, 210, 107 S. Ct. 1702, 1708 (1987) (explaining that judicial efficiency and fairness generally favor joint trials).

**D. Gonzalez's Other Convictions**

Appellant Gonzalez argues that the evidence was insufficient to support his convictions on Counts Three and Five, which charged him with obstructing justice by giving false and misleading testimony in a civil deposition, in violation of 18 U.S.C. § 1512(b)(3) (Count Three), and perjury before a federal grand jury, in

violation of 18 U.S.C. § 1623 (Count Five).[26]

On August 10, 2000, in the civil suit by Wiltshire's estate in the United States District Court for the Southern District of Florida, Appellant Gonzalez gave a sworn deposition. Gonzalez's August 10, 2000 deposition concerns the I-395 shootings, and is the subject of his obstruction-of-justice conviction in Count Three. In this deposition, Appellant Gonzalez testified that at the time of the I-395 shootings, he believed Wiltshire was armed and he saw what he believed was a handgun in Wiltshire's right hand, as follows:

**Question**: When you look, if you did look, what did you observe on North Miami Avenue?

**Answer** (Gonzalez): I observed one of the offenders [i.e., Wiltshire] running northbound on a sidewalk on the west side of Miami Avenue.

**Question:** One of the offenders running northbound on Miami Avenue on the west side away from your position?

**Answer:** Correct.

**Question:** Do you see any officers in hot pursuit of that offender?

---

[26]Section 1623(a) states that "[w]hoever under oath (or in any declaration, certificate, verification, or statement under penalty of perjury as permitted under section 1746 of title 28, United States Code) in any proceeding before or ancillary to any court or grand jury of the United States knowingly makes any false material declaration or makes or uses any other information, including any book, paper, document, record, recording, or other material, knowing the same to contain any false material declaration, shall be fined under this title or imprisoned not more than five years, or both." 18 U.S.C. § 1623(a).

**Answer:** No, I do not.

**Question:** What do you do next?

**Answer:** I see that, <u>I believe him to be armed. I see what I believe is a handgun</u>.

**Question:** What made you believe the offender was armed?

**Answer:** <u>Well, I saw what I believe is a handgun as he ran down the street</u>.

**Question:** <u>Did he have anything in his or her hands?</u>

**Answer:** <u>Yes</u>.

**Question:** <u>Okay. What?</u>

**Answer:** <u>What I believed was a handgun</u>.

**Question:** And what did you do next?

**Answer:** At that time, I fired twice at the individual.

**Question:** Okay. Now, when you said you saw something in the individual's hand, did you see something in his right hand or left hand or both?

**Answer:** I saw his right hand.

March 10, 2004 Trial Tr. at 87-89 (quoting Gonzalez Dep.) (emphasis added).

Later, during the same sworn deposition, the following exchange occurred:

**Question:** You say 'known to be armed.' Isn't the most accurate way to say it at least is you felt he was armed?

40

**Answer:** Right. I felt he was armed, that's correct.

Id. at 93. On August 16, 2001, Appellant Gonzalez testified before the federal grand jury, again about the I-395 shootings. Gonzalez's August 16, 2001 sworn testimony is the subject of his perjury conviction in Count Five. Before the grand jury, Appellant Gonzalez testified that he saw a weapon in Wiltshire's right hand and believed that he was armed, as follows:

| | |
|---|---|
| **Question**: | Tell us what happened after you were focused on the person [i.e., Wiltshire] running on Miami Avenue? |
| **Answer** (Gonzalez): | I discharged my weapon twice. It appeared that it had no effect, so I surmised maybe I missed him, and I told [sic] continued running northerly. I felt any other attempt to discharge my weapon again was going to be futile. If there was any likelihood that I was going to strike him, it would be with the first two, so I am not going to get him with the next two. |

. . . .

**Question:** You stopped after firing twice?

**Answer:** Yes.

**Question:** Subsequent to that, are you hearing gunshots?

**Answer:** Yes, I am still hearing gunshots.

41

**Question:** Is it 20 yards past the overpass? Is it – at that point did you see what you believed to be a weapon?

**Answer:** I believed that he was armed, yes.

**Question:** Do you recall where you saw the weapon?

**Answer:** As he was running, in his right hand.

**Question:** And you were able to see it as he is running?

**Answer:** Yes.

**Question:** Did you ever see him turn around?

**Answer:** He did not turn around.

**Question:** Did he point the weapon?

**Answer:** No, he did not.

**Question:** You just saw him carrying the weapon as he was running, right?

**Answer:** Right.

Id. at 94-96 (emphasis added). Later, during the same grand jury testimony, Appellant Gonzalez testified that although he was not certain, he believed what he saw was a handgun in Wiltshire's hand, as follows:

**Question:** How certain are you that what you saw in his hand was a gun?

**Answer:** I am not certain. I believe it to be a handgun. That is

42

> factoring all the circumstances as well.

**Question:** One of the things that led you to believe it was the fact that you heard gunshots?

**Answer:** Certainly, yes.

**Question:** Is that something that affected your perception of whatever it was that you saw in his hand?

**Answer:** Certainly that factored into it, yes. I surmised it was.

Id. at 100-01 (emphasis added). Appellant Gonzalez's sufficiency-of-the-evidence argument focuses on his contention that his testimony in both the civil deposition and before the criminal grand jury conveyed only his uncertainty about whether Wiltshire had a gun.

Gonzalez's brief states: "[w]e readily acknowledge that a witness cannot avoid a perjury charge merely by inserting the words 'I believe' in every answer." Gonzalez Br. at 17. Gonzalez is correct, because a witness's false sworn statement about the witness's knowledge and beliefs can support a perjury conviction.[27] What

---

[27]Although we could not locate an "I believe" perjury case in our circuit, Gonzalez's brief cites such a case from the Ninth Circuit. See United States v. Ponticelli, 622 F.2d 985, 988-89 (9th Cir. 1980), overruled on other grounds, United States v. De Bright, 730 F.2d 1255, 1259 (9th Cir. 1984) (en banc). In Ponticelli, the Ninth Circuit panel explained:
> Ponticelli notes that he testified to the grand jury only as to his memory and his opinions. Given the subjective nature of such statements, he argues, the jury could not conclude beyond a reasonable doubt that his testimony was knowingly false. See Brief for Appellant at 22-23. Juries can and do make inquiries every day into the actual state of mind of criminal defendants. For example, it is hornbook law that, in prosecuting a defendant for an attempt to commit a crime, the government

Gonzalez argues instead is that "a full reading of the entire transcript demonstrates that is not what we have here." Id. Gonzalez asserts that his testimony, when viewed in context, was not that he believed Wiltshire had a gun but only that he was not sure or certain whether Wiltshire had a gun. In effect, Appellant Gonzalez's position is that his testimony, taken as a whole, was that "he was not certain whether Wiltshire had a gun." Id. at 19.

We agree with Gonzalez that in perjury cases, district courts should view a witness's testimony as a whole and his statements should not be taken out of context. See Van Liew v. United States, 321 F.2d 674, 678 (5th Cir. 1963)[28] ("A charge of perjury may not be sustained by the device of lifting a statement of the accused out of its immediate context and thus giving it a meaning wholly different than that which its context clearly shows.") (quotation marks and citation omitted). We disagree, however, with Gonzalez's reading of his testimony as a whole. We have quoted the entire relevant portion of both his deposition and grand jury testimony because it

must prove a specific intent to commit the crime that is the subject of the attempt. That the inquiry is subjective rather than objective does not preclude prosecution. Ponticelli's argument proves too much. If it were accepted, a grand jury witness could deceive a grand jury or frustrate its inquiry with impunity, simply by prefacing each sentence with the words 'I believe.'

Ponticelli, 622 F.2d at 988.

[28]The Eleventh Circuit has adopted as binding precedent all of the decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981. Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc).

44

speaks for itself. In his civil deposition, Appellant Gonzalez swore repeatedly that: (1) "I believe him to be armed"; (2) "I see what I believe is a handgun"; (3) "I saw what I believe is a handgun as he ran down the street." In response to the question, "[d]id [Wiltshire] have anything in his or her hands?," Gonzalez replied, "[w]hat I believed was a handgun."

Appellant Gonzalez's testimony before the grand jury was the same. Before the grand jury, Gonzalez swore that "I believed that he was armed." As to where Gonzalez saw the weapon, Gonzalez replied, "[a]s he was running, in his right hand." To the question, "[w]ere you able to see it as he is running," Gonzalez answered, "[y]es." To the question, "[y]ou just saw him carrying the weapon as he was running right?," Gonzalez answered, "[r]ight." Even when Gonzalez expressed at the end that he was not certain, he still repeated his belief that Wiltshire had a handgun, stating that "I am not certain. I believe it to be a handgun."

Appellant Gonzalez's testimony that he believed Wiltshire was armed, viewed in context, clearly conveyed not merely the possibility that the suspect was armed, but that he, as an officer on the scene, thought or believed the suspect was armed.[29]

---

[29]The challenged testimony was clearly material, because "[t]he test for materiality is whether the false statement was capable of influencing or misleading a tribunal on any proper matter of inquiry." United States v. Roberts, 308 F.3d 1147, 1155 (11th Cir. 2002). "Even if the false statement failed to influence the tribunal, it is sufficient if it was capable of influencing the tribunal on the issue before it." Id.; see also United States v. Corbin, 734 F.2d 643, 654 (11th Cir. 1984) (same).

The key question, then, is whether there was sufficient evidence for the jury to have concluded that Gonzalez knew in fact that Wiltshire was unarmed and never actually believed that Wiltshire had a gun. As noted at trial, there was overwhelming evidence that Young and Wiltshire were not in fact armed, and that Appellants conspired to plant guns and then lie about whether Young and Wiltshire had been armed. Indeed, Officers Mervolion and Hames testified at trial that at the time of the shooting – even when they fired at the suspects – they never believed that Young or Wiltshire was armed.[30] Likewise, Officer Bell testified that he could see Young and Wiltshire's hands in the air as they dropped from the I-395 overpass – before any shots were fired – and observed that they did not have guns.

Especially significant is the substantial evidence of Gonzalez's participation in the conspiracy to mislead investigators about the I-395 shootings. According to the testimony of Officer Mervolion, at a lunch meeting on November 8, 1995, the day after the I-395 shootings, Appellant Gonzalez and the other officers involved in the shootings explicitly conspired to lie about the shootings. The officers agreed upon a cover story, namely to tell investigators that Wiltshire and Young had been armed and had been holding firearms in their right hands. Shortly thereafter, the officers

---

[30]Rather, according to their testimony, Officers Mervolion and Hames fired at Young and Wiltshire because they were dangerous fleeing felons and the officers felt that firing on them was a justified last resort.

who attended the conspiratorial meeting, including Appellant Gonzalez, each gave nearly identical sworn testimony that mirrored exactly the fabricated story they settled upon at the November 8, 1995, lunch meeting. Notably, in Appellant Gonzalez's sworn statement on November 14, 1995 – seven days after the shooting – Gonzalez declared without reservation (and exactly in concert with the statements of his co-conspirators) that "I see that he is armed with a handgun and I recall it was in his right hand." Gonzalez also claimed to have seen that the gun was a "semiautomatic" and was "black or blue steel."[31]

Gonzalez's false testimony in his initial statement and his participation in a conspiracy to mislead investigators gave the jury ample basis to doubt the veracity of his second and third sworn statements that at the time of the I-395 shootings he believed Wiltshire had a handgun. The jury also understood that Appellant Gonzalez's testimony in Wiltshire's civil suit and before the federal grand jury

---

[31]More specifically, in his November 14, 1995 sworn statement, Appellant Gonzalez testified as follows concerning what he saw and what transpired at the I-395 shootings:

Question: Now, when you observe the subject [i.e., Wiltshire] from closer to the west embankment, in which direction is he running?
Answer: He is running northbound on North Miami Avenue.
Question: Do you see anything in his hand, and if you do, in which hand?
Answer: I see he is armed with a handgun and I recall it was in his right hand.
Question: Do you recall what color firearm it was and what type?
Answer: It was black or blue steel and it was a semiautomatic.
Question: What happens when you see the subject running?
Answer: I get to a modified point and I fired off a couple of rounds at him.

March 9, 2004 Trial Tr. at 241-42 (quoting Gonzalez Dep.).

occurred years after the I-395 shootings themselves, at a point when Gonzalez knew that a federal criminal investigation was pending. In light of the evidence of the shootings themselves and the officers' orchestrated efforts to mislead, the jury reasonably concluded that even Gonzalez's "belief" testimony of 2000 and 2001 was untrue.

Finally, we reject Appellant Gonzalez's claim as to Count Three that there was no possibility that his civil deposition would be communicated to federal authorities. See 18 U.S.C. § 1512(b)(3). At the time of Gonzalez's civil deposition in 2000, the FBI already had opened its extensive civil rights investigation into the shooting incidents and had begun to review all of the post-shooting statements by the officers involved. The deposition was given in a lawsuit brought by Wiltshire's estate for the wrongful death of Wiltshire, one of the victims in the I-395 shootings. Given that the lawsuit and the FBI's investigation were focused on the same shooting and the same victim, the jury could reasonably infer that Gonzalez intended to hinder and obstruct not only Wiltshire's civil rights lawsuit but also the federal investigation into the conduct of the officers arising out of the same incidents at issue in the lawsuit.[32]

---

[32]For the same reason, we reject Appellant Garcia's argument that there was no possibility that his deposition on October 30, 1998, in the criminal trial of Jerry Miller, would be communicated to federal authorities, and that insufficient evidence therefore supported Garcia's conviction for obstruction of justice under 18 U.S.C. § 1512(b)(3). By the time of Appellant Garcia's deposition in Miller's trial, the FBI investigation into the officers' conduct in the I-395 shootings had been ongoing for over a year. Miller's trial concerned whether Miller was guilty of crimes arising out of the robbery that led to the police chase and shootings of Young and

Accordingly, we conclude that sufficient evidence supported Appellant Gonzalez's convictions on Counts Three and Five.

## E.    Extrinsic Evidence in Second Trial

During the second trial, Appellants Garcia, Gonzalez, and Quintero moved for a mistrial on the grounds that the jury was tainted by extrinsic evidence introduced by two former jurors dismissed during deliberations. After their convictions, Appellants also moved for a new trial on the same grounds. The district court denied both their motions for a mistrial and their motions for a new trial, and Appellants reassert their tainted jury claim on appeal.[33]

After a five-week trial followed by five days (approximately twenty-five hours) of deliberation, a series of notes from jury members in the second trial led the district court to dismiss three jurors and seat two alternates. The dismissals all occurred in succession over two days. We first review why three jurors were dismissed during the trial, and then explain why the district court did not abuse its discretion in denying Appellants' motions.

---

Wiltshire. Accordingly, it was a virtual certainty that Garcia's testimony would be transferred to federal authorities.

[33]We review the denial of a motion for a new trial based on the jury's exposure to extrinsic evidence for abuse of discretion. United States v. Martinez, 14 F.3d 543, 547 (11th Cir. 1994). Likewise, we review a district court's denial of a motion for mistrial for abuse of discretion. United States v. Ramirez, 426 F.3d 1344, 1353 (11th Cir. 2005).

49

**(1)     Juror #10**

Juror #10 advised the court by note that her apartment had been burglarized and that she thought the burglary might have been related to her jury service. After receiving the note, the district court interviewed Juror #10 outside the presence of the other jurors, revealing that (1) Juror #10 suspected that the defense might have been involved in the burglary; (2) Juror #10 was concerned for her safety; and (3) Juror #10 had read her note to the entire jury and expressed her concern to them.[34] Juror #10 claimed, however, that she could still perform her duties as a juror impartially.

The parties agreed that the other jurors needed to be questioned individually about Juror #10's note. Upon individual questioning, all eleven jurors testified that they were aware of the note and Juror #10's fear, as it had been discussed in the jury room.[35] Nevertheless, all jurors stated that it would not affect their impartiality. However, one Juror (Juror #4) individually admitted that Juror #10's story scared her, although Juror #4 stated that the fear would not affect her performance on the jury.

---

[34]The note stated in full:
Judge Gold,
        On Tuesday evening, while I was asleep, someone entered my apartment and removed the door to my air-conditioning closet. I must consider the possibility that this event is related to my service on this case. I am concerned for my safety. I filed a police report yesterday, and the officers advised me to notify the U.S. attorney's office. I leave the matter to your discretion. Thank you.

[35]Throughout this opinion when we say a juror was questioned "individually," we mean that the district court questioned the juror alone and outside the presence of the other jurors, a practice the district court followed carefully and consistently.

50

At the conclusion of questioning each juror, the district court reminded each juror of their commitment to decide the case purely on the basis of the evidence produced during trial.

Appellants Garcia, Gonzalez, and Quintero all moved for a mistrial, which the district court denied. Given that there would be no mistrial, the government and the defense agreed that Juror #10 should be dismissed. Because the jury was already well into deliberating, the parties agreed to continue the trial with only eleven jurors. After bringing the entire jury back into the courtroom, the district court instructed the jury that it was convinced that the burglary of Juror #10's apartment was unrelated to the trial. The district court reiterated that the jury was to disregard the incident and decide the case based solely on the evidence presented in court.

### (2)    Juror #1

At the same time that Juror #10 was being dismissed, Juror #11 gave the court a note alleging that Juror #1 had told the other jurors that she was watching the news and researching the case. Juror #11's note alleged that Juror #1 had tried to find out the result in the first trial and was trying to tell the other jurors about what she knew. The note also alleged that Juror #1 was refusing to deliberate.

Outside the presence of the other jurors, the district court questioned Juror #1, confining its inquiry to the issue of whether she had become aware of extrinsic

evidence.  After initially denying watching the news, Juror #1 admitted that she had heard the news once, after which she had joked with the other jurors because the news report had stated that she was fifty years old when she in fact was seventy-two. Juror #1 also stated that she had seen the media "interviewing the defendants" but provided no details.  Juror #1 claimed that she had not heard the results from the first trial, done any research, or told the jurors anything of substance.

The district court then questioned the remaining jurors individually.  In direct contradiction to Juror #1's explanation, six jurors asserted that Juror #1 had told them that she had watched news reports about the trial and that she had conducted research to find out the results of the previous trial.  Two of these jurors asserted that Juror #1 had "made references" to her extrinsic knowledge and that they had asked Juror #1 what information she had.  However, all six jurors assured the court that ultimately Juror #1 had not conveyed extrinsic evidence to them.

After hearing from each juror, the district court found Juror #1's assertions that she had done no research not credible.  The district court ruled that it was beyond a reasonable doubt that Juror #1 had done independent research and that she blatantly disregarded the court's instructions not to listen to the news.  See United States v. Abbell, 271 F.3d 1286, 1302 (11th Cir. 2001) (stating that a juror should be excused only when, beyond a reasonable doubt, no substantial possibility exists that the juror

52

is basing her decision on the sufficiency of the evidence). The district court therefore dismissed Juror #1.

Appellants moved for a mistrial, and objected to the removal of Juror #1. Appellants made alternative arguments. On the one hand, Appellants claimed that the extrinsic evidence Juror #1 had learned and shared with the other jurors tainted the entire jury, requiring a mistrial. On the other hand, Appellants claimed that Juror #1 had testified truthfully, had not been exposed to any extrinsic evidence at all, and should not be dismissed. Appellants theorized that the jurors who complained about Juror #1 had invented the story about her watching the news in order to remove her from the jury, when their real motivation was their frustration with Juror #1's refusal to change her position during deliberation. The district court rejected both arguments and denied Appellants' motion for mistrial.

### (3)    Juror #4

As the district court was finalizing its response about Juror #1, Juror #4 sent a note requesting to be dismissed because the trial was adversely affecting her sleep and health. Juror #4's note also indicated that she was "being insulted, yelled at and offended by other jurors." The parties and the district court were concerned that Juror #4's request for dismissal was not health-related but rather was motivated by the deliberations themselves.

53

The district court questioned Juror #4 outside the presence of the other jurors. She claimed that her request was not related to her opinion in deliberations, but rather truly was due to health concerns. Juror #4 explained that she had felt the same way previously and had been hospitalized for three days.

The district court elected to delay deliberations so that Juror #4 could see her doctor, who might be able to determine whether her complaints were truly health-related. Juror #4 went to her doctor on the afternoon of March 29, 2004. Juror #4 did not report for jury duty on March 30, 2004, at which point the district court contacted Juror #4's doctor. Testifying by phone, the doctor explained that Juror #4 had a history of panic attacks and depression and that her mother had died recently. The doctor told the district court that "my medical opinion is that she just is not mentally capable of handling [jury service] at this point." The district court accepted the doctor's professional judgment and dismissed Juror #4 over the objections of Appellants.

**(4)  Two Alternates Empaneled**

After the three jurors were dismissed, the parties agreed to add two alternates rather than three. Two alternates were empaneled, and the Appellants raised no objections to them. The district court ordered that all notes from the first five days of deliberation be removed from the jury room and instructed the jury to begin anew.

The district court also gave the reconstituted jury the entire legal instructions once more. The new jury deliberated for a total of fourteen hours before reaching a verdict of guilty on all counts.

**(5)    Motions Properly Denied**

On appeal, Appellants argue that a mistrial during the trial, or alternatively at least a new trial after their convictions, was required because the jury was tainted by extrinsic information, in particular (1) the jurors' knowledge of Juror #10's burglary-related fear, and (2) the fact that Juror #1 told the other jurors that she had read the news and researched the first trial. Although the jury was clearly exposed to this extrinsic evidence on account of Jurors #1 and #10, we conclude that the district court did not err in denying Appellants' motions.

A mistrial or new trial is required only if the extrinsic evidence known by the jury posed a reasonable possibility of prejudice to the defendant. United States v. Perkins, 748 F.2d 1519, 1533 (11th Cir. 1984). The defendant has the burden to show that the jury has been exposed to extrinsic evidence or extrinsic contacts. Once the defendant establishes that such exposure in fact occurred, prejudice is presumed and the burden shifts to the government to rebut the presumption. See Remmer v. United States, 347 U.S. 227, 229, 74 S. Ct. 450, 451 (1954); McNair v. Campbell, 416 F.3d 1291, 1307-08 (11th Cir. 2005), cert. denied, __ U.S. __ , 126 S. Ct. 1828

(2006); Parker v. Head, 244 F.3d 831, 839 (11th Cir. 2001); United States v.

Martinez, 14 F.3d 543, 550 (11th Cir. 1994); United States v. Spurlock, 811 F.2d

1461, 1463 (11th Cir. 1987); United States v. Caporale, 806 F.2d 1487, 1503 (11th

Cir. 1986); Perkins, 748 F.2d at 1533.[36]

To rebut the presumption of prejudice, the government must show that the

jurors' consideration of extrinsic evidence was harmless to the defendant. Remmer,

347 U.S. at 229, 74 S. Ct. at 451; McNair, 416 F.3d at 1307-08; Caporale, 806 F.2d at

1503; Perkins, 748 F.2d at 1533-34. To evaluate whether the government has

rebutted that presumption, we consider the totality of the circumstances surrounding

the introduction of the extrinsic evidence to the jury. Remmer, 347 U.S. at 229-30, 74

S. Ct. at 451; McNair, 416 F.3d at 1307-08; Parker, 244 F.3d at 839. The factors we

consider include: (1) the nature of the extrinsic evidence; (2) the manner in which the

---

[36]Although prior precedent recognized the presumption of prejudice from Remmer, this Court, on at least two later occasions, has stated that prejudice is not presumed even when jurors considered extrinsic evidence. United States v. Rowe, 906 F.2d 654, 656-57 (11th Cir. 1990); United States v. De La Vega, 913 F.2d 861, 870 (11th Cir. 1990). In Martinez, we recognized "the apparent conflict between the standard pronounced in Rowe and the unambiguous mandate of Remmer." Martinez, 14 F.3d at 550 n.3. We declined to resolve the conflict because it had no bearing on the outcome in Martinez. Id.

In Parker, we noted that two of our sister circuits have suggested that since Remmer, the Supreme Court has abandoned, at least in part, the presumption of prejudice arising from the exposure of the jury to extrinsic evidence. Parker, 244 F.3d at 839 n.6. The Parker Court also declined to consider the issue further because the presumption did not drive the disposition. Id.

As in Martinez and Parker, the presumption of prejudice does not drive the outcome of the instant dispute. Even granting Appellants the presumption of prejudice, we conclude that the government has sufficiently rebutted that presumption. Accordingly, we again decline to consider the issue further.

information reached the jury; (3) the factual findings in the district court and the manner of the court's inquiry into the juror issues; and (4) the strength of the government's case. See McNair, 416 F.3d at 1307-08.

In this case, the nature of the extrinsic evidence and the district court's thorough and careful response to that evidence convince us that the presumption of prejudice has been clearly rebutted. First and foremost, the nature of the extrinsic evidence here was relatively inconsequential and ultimately does not indicate prejudice. Not a single juror learned anything substantive about the first trial from Juror #1,[37] nor did a single juror claim to believe that the burglary at Juror #10's residence was in any way related to the trial. The district court also took care to instruct the jury that the burglary was in no way related to the trial, and that the jury was to reach a verdict based solely on the evidence presented at trial. Thus, the government has shown that the particular extrinsic evidence at issue in this case was not only unlikely to prejudice the jury in any meaningful fashion, but also did not in fact prejudice the jury.

---

[37]Although every juror stated that Juror #1 did not convey any substantively relevant extrinsic evidence to them, Appellants argue that the circumstances suggest that Juror #1 must have related prejudicial substantive information, about the first trial or otherwise, to the remaining jurors. However, the record is devoid of evidence that Juror #1 communicated any extrinsic evidence to the jury, other than the fact that she herself had read the news and learned extrinsic evidence. Without knowing what information Juror #1 gained from her investigation and without any evidence in the record that the other jurors were exposed to that information, there is no evidence supporting Appellants' claim that the remaining jurors were prejudiced by Juror #1.

57

Second, the record demonstrates that the district court carefully, thoroughly and correctly handled these issues at trial. The district court began by carefully investigating the juror issues. See Rowe, 906 F.2d at 656-57. In addition to interviewing Jurors #10 and #1 outside the presence of the other jurors, the district court interviewed every other juror individually and conferred extensively with counsel to decide upon a course of action.

After speaking with each juror, the district court wisely chose to dismiss Jurors #10 and #1, the two jurors who had introduced the extrinsic evidence. The district court then rehabilitated the remaining jurors by curatively instructing the jury not to consider the extrinsic evidence, by reissuing the entire legal instructions to the newly constituted jury, and by emphasizing multiple times that the reconstituted jury should begin deliberations anew. The district court concluded that (as every juror individually testified) the extrinsic evidence did not prejudice the remaining jurors nor render any juror incapable of deciding the case impartially.

In light of every juror's assurance to the district court that the extrinsic evidence would not affect their impartiality, and especially given the district court's careful investigation and curative measures, we agree with the district court that there was no reasonable possibility of prejudice. The manner in which the district court inquired of the jury in this case closely parallels United States v. Gabay, 923 F.2d

1536 (11th Cir. 1991), where this Court affirmed a district court's conclusion that a dismissed juror's extrinsic discussions did not preclude a fair trial. In Gabay, we deferred to the district court's assessment of the remaining jurors' impartiality, noting in particular the district court's "careful and lengthy investigation," which included voir dire and curative instructions. Id. at 1542-43. We also noted the district court's "observation of the jurors for several weeks, and the jurors' unequivocal pledges to deliberate fairly." Id. at 1543.

Here, the district court's careful and lengthy efforts to ensure that the jury remained impartial are quite similar to those taken in Gabay. As in Gabay, the district court's reasonable conclusion that the jury was not tainted demands deference because the "'determination of [the jury's] impartiality, in which demeanor plays such an important part, is particularly within the province of the trial judge.'" Ristaino v. Ross, 424 U.S. 589, 595, 96 S. Ct. 1017, 1020 (1976) (quoting Rideau v. Louisiana, 373 U.S. 723, 733, 83 S. Ct. 1417, 1423 (1963) (Clark, J., dissenting)). As this Court has stated, "[t]he factual determination of whether consideration of extrinsic evidence caused the defendant prejudice is committed to the trial court's 'large discretion.'" BankAtlantic v. Blythe Eastman Paine Webber, Inc., 955 F.2d 1467, 1472 (11th Cir. 1992); see also Martinez, 14 F.3d at 547 (a district court's denial of a motion for a new trial based on jury's exposure to extrinsic evidence is

59

reviewed for abuse of discretion).

Despite unusual circumstances, the district court ensured that the extrinsic evidence did not pose a reasonable possibility of prejudice. After extensive review of the trial transcript and district court orders, we are confident that the district court did not abuse its discretion in denying Appellants' motions. Rather, the district court carefully rehabilitated and instructed the reconstituted jury, and there is no evidence that the extrinsic evidence influenced the jury in any way. See United States v. Kopituk, 690 F.2d 1289, 1307-08 (11th Cir. 1982) (affirming the district court's decision to dismiss a juror and replace her with an alternate after five days of deliberation).

## IV. APPEAL OF SENTENCES

Appellants contend that resentencing is required because their sentences violate United States v. Booker, 543 U.S. 220, 125 S. Ct. 738 (2005). We first review Appellants' sentences, and then the Booker issues.

### A. Sentences

Appellants Ronda, Aguero, Beguiristain and Castello – those Appellants convicted in the first trial – were sentenced at a hearing held on October 9, 2003. The Presentence Investigation Reports ("PSIs") for all four Appellants assigned them a base offense level of 12 under U.S.S.G. § 2J1.2(a). Appellants Ronda and Castello

were assigned no enhancements or reductions; their offense levels of 12 and criminal history categories of I produced a Guidelines range of 10 to 16 months' imprisonment.

While the PSIs also assigned a base offense level of 12 to Appellants Aguero and Beguiristain, their PSIs recommended several adjustments to that base offense level. Appellant Aguero's PSI recommended a total adjusted offense level of 19, which included: (1) a two-level enhancement for playing an organizing role in the criminal activity, see U.S.S.G. §3B1.1(c); (2) a two-level enhancement for abusing a position of public trust in a manner that significantly facilitated the commission or concealment of the offense, see U.S.S.G. § 3B1.3; and (3) a three-level increase pursuant to the multiple count Guidelines, see U.S.S.G. §§ 3D1.1 through 3D1.5.[38] Appellant Aguero's total adjusted offense level of 19 and his criminal history category of I produced a Guidelines range of 30 to 37 months' imprisonment.

Appellant Beguiristain's PSI recommended a total adjusted offense level of 17.

---

[38]The PSI assessed a multiple count adjustment for Appellant Aguero's participation in the conspiracy to obstruct justice in relation to three shootings: I-395, Coconut Grove, and 43rd Street. Although the indictment charged Aguero with a single count of conspiracy, under the Guidelines, "[a] conviction on a count charging a conspiracy to commit more than one offense shall be treated as if the defendant had been convicted on a separate count of conspiracy for each offense that the defendant conspired to commit." U.S.S.G. § 1B1.2(d). Thus, for purposes of the multiple count Guidelines, the evidence showed that Appellant Aguero participated in three separate counts of conspiracy to obstruct justice. In contrast, Appellants Ronda and Castello participated only in the Coconut Grove shooting, and were not subject to the multiple count adjustment.

In addition to Beguiristain's base offense level of 12, the PSI added: (1) a two-level enhancement for abusing a position of public trust in a manner that significantly facilitated the commission or concealment of the offense, see U.S.S.G. § 3B1.3; and (2) a three-level increase pursuant to the multiple count Guidelines, see U.S.S.G. §§ 3D1.1 through 3D1.5.[39]  Appellant Beguiristain's total adjusted offense level of 17 and his criminal history category of I produced a Guidelines range of 24 to 30 months' imprisonment.

At the October 9, 2003 sentencing hearing, the district court sentenced Appellants Ronda and Castello to 13 months' imprisonment, the middle of their Guidelines range.  The district court sentenced Appellant Aguero to 37 months' imprisonment, the high end of his Guidelines range, and sentenced Appellant Beguiristain to 27 months' imprisonment, the middle of his Guidelines range.[40]  In imposing these sentences, the district court stressed, inter alia, the seriousness of the offenses, the need to deter future criminal activity, and in particular Appellant Aguero's role as the most culpable participant in the conspiracy, as follows:

---

[39]Appellant Beguiristain received the multiple count adjustment because, like Appellant Aguero, the evidence showed that he participated in the conspiracy to obstruct justice in relation to three shootings: I-395, Coconut Grove, and 43rd Street.  See U.S.S.G. § 1B1.2(d).

[40]In a separate order, the district court denied Appellants Aguero, Beguiristain, Castello and Ronda's motions for downward departure, in which they argued that they would be susceptible to abuse in prison.  The district court stated that "[w]hile I do have discretion to depart downward on this ground, I do not find that this is an appropriate case for this extraordinary departure."

[T]he crimes committed by these former police officers are very serious in nature and should be punished as such.

It is my view that each sentence imposed should reflect not only the seriousness of the crime but each defendant's role and participation in the overall conspiracy.

Furthermore, the sentences imposed should serve to deter against future criminal activity by these defendants as well as by others similarly situated who may be tempted to violate the law and their oath of office to protect themselves or their fellow officers from possible state or federal criminal investigations.

Therefore, I shall impose full prison terms for Defendants Ronda and Castello and Beguiristain at mid-range within their respective Sentencing Guidelines.

With respect to Defendant Aguero, I find that he is the most culpable member of the conspiracy. I also shall take into account his prior inappropriate conduct while serving as a police officer in sentencing him at the upper end of the guidelines.

Oct. 29, 2003 Sentencing Tr. at 44.

Appellants Garcia, Gonzalez and Quintero – the Appellants convicted in the second trial – were sentenced at a hearing on November 16, 2004. The PSIs assigned Appellants Garcia, Gonzalez and Quintero a base offense level of 12 under U.S.S.G. § 2J1.2(a) and no enhancements or reductions. As all three Appellants were assigned to criminal history category I, their Guidelines ranges were 10 to 16 months' imprisonment.

The district court then sentenced Appellants Garcia, Gonzalez and Quintero each to 16 months' imprisonment, the high end of the Guidelines range, after considering the nature of the crimes and Appellants' roles in the offenses in relation

63

to the other Appellants.[41]  The district court expressed compassion for the

circumstances faced by Appellants and their families, but emphasized the seriousness

of the crimes as follows:

> These matters are beyond the compassion I feel for the individuals
> associated with this case.  They involve serious crimes, and this I-395
> aspect involved the death of two individuals.  The concealment
> relating to these deaths I find even more serious, both in kind and
> degree than the incidents involved in Coconut Grove, which in and of
> themselves were serious, although the injury involved was less
> serious.
>
> Defendants Garcia and Quintero were very active, involved in
> gun planting incidents here and the cover-up.  It is a sad thing that
> Defendant Gonzalez, who had a leadership role at the time, did not
> take active steps to prevent or stop the conspiracy as it evolved based
> upon the matters that were presented to the jury in terms of what
> occurred at the scene and what occurred thereafter.
>
> All these are serious matters that require the Court to act
> accordingly.

Nov. 16, 2004 Sentencing Tr. at 42-43.

## B.    Booker

For the first time on appeal, all Appellants challenge their sentences based on

Booker.[42]  Because Appellants did not raise the Blakely/Booker issue in district court,

---

[41]At the sentencing hearing on November 16, 2004, the district court denied Appellant Gonzalez's motion for a downward departure, explaining that while the court had discretion, no exceptional circumstances warranted such a departure for Appellant Gonzalez.

[42]In the district court, Appellants Aguero and Beguiristain contended that the district court misapplied certain sentencing Guidelines. Appellants' briefs on appeal do not focus on Guidelines application issues, but rather focus only on Booker issues.  However, to the extent Appellants' initial briefs reassert these claims, "[w]e review de novo the district court's interpretation and application of the Sentencing Guidelines and review the underlying factual

we review this issue for plain error.[43]

Under a plain-error analysis, an appellant must show "'(1) error, (2) that is plain, and (3) that affects substantial rights.'" United States v. Rodriguez, 398 F.3d 1291, 1298 (11th Cir.) (quoting United States v. Cotton, 535 U.S. 625, 631, 122 S. Ct. 1781, 1785 (2002)), cert. denied, 125 S. Ct. 2935 (2005). If the appellant is able to make a showing of all three, we then may exercise discretion to notice the error if the error "'seriously affect[ed] the fairness, integrity, or public reputation of judicial proceedings.'" Id. (citation omitted).

---

findings for clear error." United States v. Owens, 447 F.3d 1345, 1346 (11th Cir. 2006).

There was more than sufficient evidence in the record to support all of the district court's fact-findings at the sentencings of all of the Appellants, including those fact findings that supported the enhancements and multiple-count increases to the sentences of Appellants Aguero and Beguiristain. The district court also properly calculated the offense level and Guidelines range as to each Appellant. As such, we conclude that all of these claims lack merit and warrant no further discussion.

[43]We recognize that Appellants Ronda, Aguero, Beguiristain and Castello were sentenced before the Supreme Court decided Blakely v. Washington, 542 U.S. 296, 124 S. Ct. 2531 (2004), and that all Appellants were sentenced before Booker was decided. However, at sentencing, none of the Appellants asserted that the Guidelines were unconstitutional under Apprendi v. New Jersey, 530 U.S. 466, 120 S. Ct. 2348 (2000), or any of its progeny, nor did Appellants argue that their sentences were contrary to the Sixth Amendment. Similarly, Appellants Aguero and Beguiristain, the only Appellants to receive sentencing enhancements, did not raise any objections that preserved their constitutional objections pursuant to the requirements of United States v. Dowling, 403 F.3d 1242, 1246-47 (11th Cir.), cert. denied, __ U.S. __ , 126 S. Ct. 462 (2005).

Appellants Aguero, Beguiristain, Castello and Ronda did file post-trial Rule 33 motions requesting resentencing in light of Blakely. See Fed. R. Crim. P. 33. However, at the time Appellants sought relief under Blakely, they had already filed notices of appeal of their convictions and sentences. As such, the district court did not have jurisdiction to consider those issues, and they cannot be said to have been raised prior to appeal. See United States v. Tovar-Rico, 61 F.3d 1529, 1532 (11th Cir. 1995).

Accordingly, we review Appellants' claims for plain error. See Fed. R. Crim. P. 52(b); Dowling, 403 F.3d at 1246-47.

In the context of <u>Booker</u> errors, the appellant has shown that his substantial rights were affected "'when there is a reasonable probability that the district court would have imposed a different sentence if the guidelines were not mandatory.'" <u>United States v. York</u>, 428 F.3d 1325, 1336 (11th Cir. 2005) (citation omitted), <u>petition for cert. filed</u>, No. 05-1503 (U.S. May 22, 2006).  The third prong of the plain-error test "almost always requires that the error must have affected the outcome of the district court proceedings." <u>Rodriguez</u>, 398 F.3d at 1299 (quotation marks and citations omitted).  "The standard for showing that is the familiar reasonable probability of a different result formulation, which means a probability sufficient to undermine confidence in the outcome." <u>Id.</u> (quotation marks and citations omitted). In regard to the third prong, the burden rests with the appellant to show prejudice. <u>Id.</u> "Where errors could have cut either way and uncertainty exists, the burden is the decisive factor in the third prong of the plain error test . . . . " <u>Id.</u> at 1300.

Under <u>Booker</u>, "there are two types of sentencing errors: one is constitutional and the other is statutory." <u>United States v. Dacus</u>, 408 F.3d 686, 688 (11th Cir. 2005).  "[T]he Sixth Amendment right to trial by jury is violated where <u>under a mandatory guidelines system</u> a sentence is increased because of an enhancement based on facts found by the judge that were neither admitted by the defendant nor found by the jury." <u>Rodriguez</u>, 398 F.3d at 1298.  The statutory error occurs when

66

the district court sentences a defendant "under a mandatory Guidelines scheme, even in the absence of a Sixth Amendment enhancement violation." United States v. Shelton, 400 F.3d 1325, 1330-31 (11th Cir. 2005).

Appellants Aguero and Beguiristain have established Sixth Amendment violations under Booker because the district court enhanced their sentences under a mandatory Guidelines system based on judicially-determined fact findings that went beyond those facts admitted by Appellants or found by the jury. Rodriguez, 398 F.3d at 1298. The Sixth Amendment violations under Booker stemmed not from the district court's extra-verdict enhancements but from the district court's application of those enhancements under a mandatory Guidelines system. Id. at 1301. Further, Appellants Ronda, Castello, Garcia, Gonzalez, and Quintero have established statutory Booker error because while the district court did not assign them any extra-verdict enhancements, they too were sentenced under a mandatory Guidelines system. Shelton, 400 F.3d at 1330-31.

Because plain Booker errors occurred, all seven Appellants have established the first two prongs of plain-error review. Rodriguez, 398 F.3d at 1299.[44] However,

____

[44]In Rodriguez, we explained that while a Booker error may not have been "plain" at the pre-Booker time of sentencing, "it is enough that the error be 'plain' at the time of appellate consideration." Rodriguez, 398 F.3d at 1299 (quotation marks omitted); see also Booker, 543 U.S. at 268, 125 S. Ct. at 769 (directing that the Booker decision itself was applicable to all cases on direct appeal).

67

none of the Appellants has shown that the Booker error affected their substantial rights. Accordingly, Appellants have failed to satisfy the third prong of plain-error review. Id. The sentencing record provides no basis for a conclusion that any Appellant has a reasonable probability of receiving a more lenient sentence under an advisory Guidelines system. The district court did not make any comments that the sentences imposed were too severe. "The record indicates no frustration on the part of the district court with the severity of the Guidelines sentence[s], nor did the district court indicate a desire to impose a lesser sentence in [Appellants'] case." United States v. Underwood, 446 F.3d 1340, 1344 (11th Cir. 2006).

Rather, the district court stressed the need for either a high- or mid-range sentence because of the severity of Appellants' crimes; the need for deterrence; Appellants' status as police officers and society's need for law enforcement officers to follow the law; the role and participation of each Appellant in the conspiracy; and Appellant Aguero's heightened culpability. A sentence in the middle or high end of the range, as each Appellant received, suggests that the district court did not prefer a more lenient sentence and would not have imposed one under an advisory system.[45]

---

[45]A sentence at the low end of the Guideline range "is not in and of itself sufficient to satisfy the third-prong burden." Underwood, 446 F.3d at 1344; see also United States v. Fields, 408 F.3d 1356, 1360-61 (11th Cir.), cert. denied, __ U.S. __ , 126 S. Ct. 221 (2005). Thus, certainly, a sentence at the middle or high end of the Guidelines range is not sufficient to satisfy the third-prong burden. Indeed, it shows just the opposite.

Accordingly, Appellants have not met their burden to show a reasonable probability that the result of their sentencing would have been different but for the Booker errors. Rodriguez, 398 F.3d at 1300-01. Because Appellants have not shown that their substantial rights were adversely affected under the third prong, we need not analyze the fourth element of plain-error review. Id. at 1301.

## V.  CONCLUSION

Because Appellants have shown no reversible error, we affirm Appellants' convictions and sentences on all Counts.

**AFFIRMED.**